UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                              CRIMINAL NO: 04-10262-DPW

DEBRA D'ANDREA and
ROBERT D'ANDREA

            Defendants

## DEFENDANTS' JOINT SENTENCING MEMORANDUM

 Debra and Robert D'Andrea appeared before this Honorable Court on May 20, 2005, and pleaded guilty to twelve

counts of Failure to Collect, Account for and Pay over Taxes in violation of Title 26, U.S.C. §7202.  There is no plea

agreement in this case.

### Guideline Calculations

    The Probation Office has determined that the Total Offense Level for each defendant is 13.   Both defendants are without

a criminal history, hence they are both considered Criminal History Category I and their guideline sentencing range is 12 -18

months respectively.  The defendants have no objection to Probation's calculations of the Sentencing Guidelines.

    Pursuant to *United States v Booker,* 125 S.Ct. 738 (2005), although the Sentencing Guidelines are no longer

mandatory in imposing sentence the Court must consider the Sentencing Guidelines and Policy Statements and determine what

the Guidelines sentence would be.  In that regard, the Sentencing Commission has provided guidance in determining when there

may be factors that mitigate the presumptive guideline range.

### Defendants' Joint Motion for Downward Departure

    The defendants have submitted separately a joint motion for downward departure. As reason therefore, the defendants

submit that their offense is outside the heartland of  Title 26 U.S.C. §7202 tax violations.  Although they knew they were

breaking the law at the time they committed the offense, their motivation was always to save the business and get their finances

in shape to pay all the necessary bills. See *U.S. v Brennick,* 134 F.3d 10 (1ˢᵗ.Cir.1998)   In *Brennick*  the district court

departed downward from a range of 24-30 months from 1988. Defendant followed a regular pattern of withholding taxes from his employees' pay but delaying payment to the government. He also frequently withdrew money from his business by means that avoided bank reports to the IRS. After the IRS met with him to discuss his late payments, he removed large sums of money from the business. In addition, he began to file false quarterly withholding tax returns. He was convicted of failure to pay withheld taxes, structuring, and obstructing the IRS. The district court departed downward to a sentence of thirteen months, indicating that unlike the typical tax evader, defendant did not intend to permanently deprive the government of the money. Analogizing to the fraud guideline, among other reasons, the district court said that there were multiple causes of the government's losses. Although the First Circuit found that these reasons were inadequate to justify the substantial departure, it also indicated that defendant's alleged intent to eventually pay the withheld taxes might justify a downward departure. However, the decision to depart and the extent of the departure were not adequately explained. "The notion in the fraud guideline that the loss table may under-or overstate the seriousness of the offense is little more than another way of saying that departures from the loss table may be warranted for good cause. Even if we treat the fraud guideline's language as generously inviting a search for such causes, the fact remains that the all-purpose departure provision remains available for tax cases whenever the case falls outside the heartland. See 18 U.S.C. §3553(b); U.S.S.G. §5K2.0". *134 F.3d at 15.*

Unlike Mr. Brennick's guideline range, the D'Andreas' guideline range is already at 12-18 months and arguably their offense conduct was not as aggressively deceptive as in the *Brennick* case. But like Brennick, the defendants' behavior was always motivated by the ultimate goal of saving their business, which, in turn, would allow them to pay the IRS what was owed. The defendants request the Court to consider a departure in this case as their criminal behavior is outside the heartland of tax offenses in the failure to withhold and pay over category.

### Sentencing Outside the Guidelines

*Booker* requires that in addition to considering the now advisory guideline calculation, the sentencing court is mandated to consider the statutory sentencing factors at 18 U.S.C. §3553(a) among which are (a)(1), the nature and circumstances of the offense and the history and characteristics of the defendant. As both these factors are, in this case, intricately intertwined, we address them as together.

### History and Characteristics of the Defendants and
### Nature and Circumstances of the Offense

Robert and Debra D'Andrea's shared experiences began even before they first met as young students in Weymouth, MA. Both grew up in tight-knit Italian-American families in this South Shore community and both use the word "good" when describing their childhood. As young people, neither had the slightest run-in with the law. Their lives were insulated and isolated from the world at large. They met and began dating when Debra was in the 9th grade and Robert was two years into high school. On graduating in 1978, Robert joined the U.S. Navy and, after completing a nine-week Steelworker School, spent most of his years in service as a steelworker and welder, building naval bases and airstrips both in the USA and abroad. He received an honorable discharge in May 1984 and shortly after returning home he and Debra became engaged. They married in 1986 and began building the three-bedroom ranch in Weymouth where they still reside. After suffering three miscarriages, Debra gave birth to three children—at present (in 2005) aged 15, 11, and 8.

On graduating from high school in 1980, Debra enrolled in Bridgewater State College where she took courses toward a major in Early Childhood Education, but she dropped out of college soon after she began. At no time has she ever taken any courses in bookkeeping or business procedures. She worked in several office jobs and then, in the late 1980s, after receiving an Office of Child Care services license, for several years ran a day-care service out of her home. After the birth of her first child in 1990, Debra stayed at home although she did take on some part time work as a cook in her parish church, a job she has recently resumed on a part time basis.

Robert, meanwhile, drawing on his skills and extensive experience gained as a steelworker in the service, had taken up a career as an iron and steel worker and by 1991 he had joined the Local 7 Ironworkers Union (in South Boston, MA). In 1994 he, with Debra's consent and cooperation, decided to start his own iron-and-steel work company; operating out of their own home and with only about $1,000 cash in the bank, they began D&D Steel. Debra was listed as the president, treasurer, clerk and director of the company but basically she was responsible only for keeping the books. Robert handled the bidding, design and implementation of the jobs undertaken—for the most part, working as a subcontractor with larger construction firms.

D&D Steel did get contracts and Robert found himself putting in long hours—sixty to seventy a week. He was successful enough that he had to hire employees to help with the work. Debra worked out of their home, handling the accounting, bookkeeping and payroll functions. D&D paid its employees by check and withheld the required sums (FICA and Federal taxes). Although D&D managed to keep operating, it began to fall deeper and deeper into debt as the D'Andreas

3

confronted a problem they had never anticipated: they were not being paid timely and/or manner by some of the firms that they were working for, yet they were expected to pay their employees and taxes on time. This then led them to hire lawyers to secure payment from the debtor contractors, thus incurring even more expenses.

With the exception of four quarters, D&D largely complied with its payroll tax obligations, accounting for the withholdings on quarterly Form 941's and annual Form 940's and paying the withheld taxes to the IRS. The exception mentioned came about not from a desire to cheat but simply from a need to keep the business alive during a period where there was a lack of cash. When the IRS conducted an audit and discovered that payments had not been made for those four quarters (June 1995 through March 1996), it imposed a $58,000 civil assessment and levy. D&D had no cash reserves to draw on and Debra, as the owner of record, filed for protection under Chapter 13 of the Bankruptcy Code. D&D ceased operations in or about February 1997.

Robert D'Andrea's reputation and work was such that he could still get contracts, so almost simultaneously with the dissolution of D&D he established RAD Steel as a Schedule C business; this was about March 1997 and it became incorporated in or about August 1999. For RAD Steel, Robert was listed as president, treasurer and clerk. It was at this point that Robert and Debra D'Andrea made what in retrospect was the wrong decision: They felt that the only way they could succeed with this new company was by putting off paying the taxes they withheld from their employees until they could get this company off the ground. Meanwhile, RAD Steel's work increased and D'Andrea had to hire more and more employees; the payroll thus increased and the inflow of payments could not keep up with the expenses. Because Debra had declared bankruptcy with the D&D Steel, they now found it hard to secure credit; without credit, they could not get the insurance required to take on contracts. Much of this is outlined in two letters submitted by the D'Andreas' attorney, Jason Pithie. (attached)

By the year 2003, RAD Steel was in such dire straits that Robert D'Andrea had to declare bankruptcy. The D'Andreas then started yet another company, RDI Ironworks; this company was set up basically to obtain workers compensation for the employees still needed to complete the projects undertaken by RAD Steel while also paying and collecting the accumulated debts. But by now it was too late and by September 2004 the government was charging the D'Andreas' for their years of tax delinquency.

Everything about their case suggests that Robert and Debra D'Andrea made a series of bad business

4

decisions, beginning with the startup of a grossly undercapitalized business. They apparently did not seek out any professional advice about how to start a business, above all the need for the amount of reserves needed to maintain a positive cash flow in a subcontracting business. Robert's talents lay in completing his work projects to the satisfaction of contractors, while Debra simply did not have the training or status required to enforce proper financial operations.

For all the seriousness of their offense, nothing that they did improved their own financial situation.  During the course of RAD and D&D, their own home was threatened foreclosure four times.  They were constantly borrowing from Peter to pay Paul and in addition to a costly new mortgage they had to negotiate  (the interest rate of their refinanced mortgage is adjustable 7.65%), they now owe thousands of dollars to lawyers and thousands more borrowed from their parents.  Meanwhile they are owed thousands of dollars from the contractors for whom they performed work.

Perhaps the best way to characterize the D'Andreas' conduct is that they were naïve and  unsophisticated.  There is no indication that they were motivated  by greed, demonstrated by their years of struggling and by the modest lifestyle they have always maintained as well as by the debts they now owe.

It is also confirmed by the many letters on their behalf from not just relatives and close friends but neighbors and people in their community. (letters attached) All describe dedicated parents and volunteers in school and church activities. Robert is respected as a coach in youth soccer, while Debra is particularly active in her church parish. Perhaps one of their longtime friends summed it up best when he wrote, "Desperate people sometimes take desperate actions."

Since January 2004, Robert has been working for Ashmont Welding of Bridgewater MA, as a foreman. The president of that firm has gone on record as follows: "Subject works full time as a foreman as stated—shows up daily and on-time.  Subject is very reliable." Although that company has recently been forced to cut his wages, he continues to earn a decent salary and he and Debra are determined to pay all the money they owe. She has recently been re-employed at St.Albert's and earns about a $120 a week as a cook and kitchen manager.

### Meeting the Purposes of this Sentence

The Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute at 18 U.S.C.§3553(a)(2) i.e., (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. (B) to afford adequate deterrence to criminal conduct. (C) to protect the public from

further crimes of the defendant, and (26) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Clearly, the D'Andreas' offense is a serious one that deserves a sentence that does not minimize the gravity of the act. Nonetheless, a just punishment for the offense need not comply with the advisory guideline range in order to meet the purpose. The Court may also consider the mitigating factors described above and mete out a sentence that addresses those factors as well as the offense.

Neither Debra nor Robert can be said to be a danger to the public.  There is no prior criminal behavior.  Notations in the criminal history for cashing checks with insufficient funds are part and parcel of the financial difficulties this couple brought upon themselves.  But indicative of basically honest people, they always made good on the checks when they finally had the money. Although the family is still in financial peril, now that Robert has a salaried job and Debra is working part time, there is a chance that they may regain some financial stability and begin paying what they owe.

All things considered, a sentence that provides some punishment but allows Robert and Debra to continue working while keeping their family together should be sufficient to meet the purposes of sentencing.  It is noted that confinement at a halfway house would require payment to the halfway house of 25% of the defendant's gross income.  A sentence of home confinement and community service would suffice to meet the ends of justice and would go a long way to ensure that bills were paid and obligations to the IRS were met.

### Conclusion

For the reasons stated above, the defendants respectfully request this Honorable

Court to sentence them to a period of home confinement, and an appropriate amount of community service.

By their attorneys,

s/                                      s/
George McMahon, Esquire                 Raymond E. Gillespie, Esquire
Attorney for Robert D'Andrea            Attorney for Debra D'Andrea
BBO No. 338240                          BBO No. 192300
308 Victory Rd                          875 Mass Ave Suite 32
North Quincy  MA  02171                 Cambridge  MA  02139
(617) 770-0600                          (617)661-3222